UNITED STATES of America
v.
Peter J. TRANTHAM, Jr., Appellant.

UNITED STATES of America
v.
Ronald PROCTOR, Appellant.

Nos. 24037, 24038.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 4, 1970.

Decided Feb. 2, 1971.

Rehearing En Banc Denied in No. 24037
July 15, 1971.

Leventhal, Circuit Judge, filed statement as to why he voted to deny rehearing en banc.

Bazelon, Chief Judge, filed statement as to why he would grant rehearing en banc.

Mr. Leonard Z. Bulman, Washington, D. C. (appointed by this Court) for appellant in No. 24,037.

Mr. Joseph Paull, Washington, D. C. (appointed by this Court) for appellant in No. 24,038.

Mr. Michael J. Madigan, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Stephen W. Grafman, Asst. U. S. Attys., were on the brief, for appellee. Mr. Julius A. Johnson, Asst. U. S. Atty., also entered an appearance for appellee in No. 24,038.

Before DANAHER, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.

PER CURIAM:

After a trial by jury the appellants and a co-defendant, one Akers, were convicted of armed robbery, robbery, and assault with a dangerous weapon (22 D.C.Code §§ 3202, 2901, 502 (1967)). A motion for judgment of acquittal by a fourth defendant, one Dockery, was granted by the district court. Akers has not appealed. We affirm the convictions of the appellants Trantham and Proctor.

At trial the proof for the government was that a few minutes before 6:00 o'clock on the afternoon of December 4, 1968, two men robbed James E. McKnight, the attendant at a parking lot at 12th and C Streets, S.W. in Washington. One of the men held a gun on McKnight while the other tied him up and took approximately $37.00 from his pockets. The $37.00 included some $10.00 or $12.00 in coins. In addition, the robbers took an unusual good luck charm and a

copper four-leaf clover. The robbery occurred in the parking lot shed or shack which was well lighted.

Before the robbers left the parking lot McKnight was able to free himself, look out the window of the shed, and see the two men running across the lot. He saw them join a third man who was apparently serving as their lookout. The three men ran together a short distance and then jumped into the passenger side of a waiting automobile. McKnight noticed that the lookout was wearing green pants and that the getaway car was a two-door red automobile. Before the getaway car was out of sight McKnight ran to the side of the parking lot where a fellow worker, Roy F. Brown, was warming up the engine of his taxi while waiting to take McKnight home. McKnight told Brown he had been robbed and the two followed the getaway car, keeping it always in their sight, except for a few seconds when they were following it around a corner. According to McKnight no one entered or left the fleeing automobile during the chase. At one point Brown's taxi closed to within "half a car length on the left" of the robbers' car; McKnight was then able to recognize the passenger on the front seat as the "man with the gun" and appellant Proctor on the rear seat as the man who had tied him up and taken his money.

The chase ended at 14th Street and Pennsylvania Avenue, N.W., where the getaway car was halted by traffic, and McKnight was able to enlist the help of a police officer. At this point the passenger in the right front seat of the robbers' car jumped out and ran, dropping a gun in the street. The policeman, Officer Jones, placed the other occupants of the automobile under arrest. He found Akers in the driver's seat, Trantham in the left rear seat, and Proctor in the right rear seat. Dockery was in the middle of the rear seat. Searching the automobile at the scene the police recovered McKnight's good luck charm and four-leaf clover from the console, which also contained approxi-

mately $7.00 in coins and $13.00 in bills. Money was also "scattered over" the back seat. In addition, the police recovered a chrome plated revolver from the street where it had been dropped by the man who fled. A second pistol was found on the back seat. McKnight testified that the chrome plated revolver resembled the one used by the robber who held him up.

McKnight positively identified Proctor as the man who had tied him up and gone through his pockets. He was unable to identify Trantham as the third man or lookout who had run from the parking lot; but he did testify that this man was wearing bright green pants. Officer Jones and another policeman testified that when arrested Trantham was wearing "bright green pants". Their report of the arrest prepared immediately after the event stated that Trantham was dressed in a "blue jacket—plaid pants".

Counsel for Trantham at trial made much of the alleged discrepancy between the testimony of the police officers that Trantham's pants were bright green and their report, made a year earlier, that the pants were "plaid". In this connection counsel elicited from one or more of the defendants testimony that they believed color photographs of the defendants had been made on the day of the arrest. Counsel then demanded that the government produce all such photographs. The photographs and several color slides were produced, including one photograph of Trantham showing a portion of his pants. We have examined the photograph and find that so far as the color of Trantham's pants is concerned it is inconclusive.

■ Trantham argues that the evidence did not support the verdict against him but we think it was plainly sufficient. The issue with respect to the color of his pants was thoroughly explored in the testimony and argued before the jury. The jury had before it the testimony of the police, the police report, and the photograph of Trantham.

In short, the case was one for the jury and we see no reason to disturb its determination. We find no basis for Trantham's suggestion that the government was guilty of some impropriety in failing to produce the photographs before they were demanded by counsel.

■ Proctor argues that it was error to receive in evidence the gun recovered from the rear seat of the robbers' automobile. We do not agree. It was a legitimate inference from the evidence that the occupants of the automobile were engaged in a joint criminal venture; and this being so the government was entitled to introduce the gun as a part of their equipment for that venture. *See* United States v. Baker, 419 F.2d 83 (2d Cir. 1969), cert. denied, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970); Payne v. United States, 111 U.S.App.D.C. 94, 294 F.2d 723, cert. denied, 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed. 2d 83 (1961); Morton v. United States, 87 U.S.App.D.C. 135, 183 F.2d 844 (1950); 1 J. Wigmore, Evidence §§ 83, 88 (3d ed. 1940).

Trantham offered an insanity defense but waived trial by jury on that issue. After hearing testimony from two psychiatrists, one called by Trantham and one by the government, the district judge concluded that the government had sustained its burden and he accordingly entered a verdict of guilty. We think the court's evaluation of the evidence and the finding are supported by substantial evidence and should not be disturbed.

We have carefully considered the other points raised by the appellants and find them to be without merit.

The judgments are affirmed.

Before BAZELON, Chief Judge, WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

PER CURIAM.

### ORDER

On consideration of appellant's suggestion for rehearing *en banc*, it is

Ordered by the Court *en banc* that the suggestion for rehearing *en banc* is denied.

Statement of Circuit Judge LEVENTHAL as to why he votes to deny rehearing en banc.

Judge Bazelon's statement for rehearing en banc puts it that the case involves substantial questions concerning the administration of the insanity defense. The panel opinion does not go into the insanity issue in depth, but its short statement is accurate:

Trantham offered an insanity defense but waived trial by jury on that issue. After hearing testimony from two psychiatrists, one called by Trantham and one by the government, the district judge concluded that the government had sustained its burden and he accordingly entered a verdict of guilty. We think the court's evaluation of the evidence and the finding are supported by substantial evidence and should not be disturbed.

To clarify the limited nature of the ruling in this case which accounts for my vote against en banc, and to put in perspective the testimony cited by Judge Bazelon, I review the record before us.

The essence of the Judge's verdict rejecting the insanity defense was his conclusion that the evidence convinced him beyond a reasonable doubt that the crime was not the "product" of a mental illness.

The Judge said he felt the Government had made a showing of nonproductivity; that the defendant did not, he believed, make a showing of productivity, and that even if he did it "has been negatived by the nature of the evidence adduced and the testimony of Dr. Strawinsky." (Tr. 49, Insanity Hearing.)

As to productivity, Dr. Robertson, after testifying Trantham was suffering from "latent schizophrenia" further testified this could have affected his involvement in a robbery (Tr. 10 ff): "I think if Mr. Trantham was in the parking lot and committed the offense on that date, that his schizophrenic reaction would be

related in several ways: One, that his judgment would be impaired and his value system would be changed by the illness. It might permit him to make offenses against others. Also, his passivity, which he has demonstrated to us, would permit him to go along with other persons and not be able to make his own independent judgment. * * * The other fact that might be related is violence. * * * Violence is a part of his illness. I think if he were in the parking lot and were involved in this crime, where there was a gun involved, that the fact that he has abnormal violence in him would permit him to go along with the group."

On cross-examination the prosecutor asked Dr. Robertson whether he had any reason to believe that Trantham had in fact committed acts of violence during the robbery. The Doctor answered, "I don't know what he did at all. But * * [i]n order for a person to be in this, he must have some thoughts. Having thoughts of violence would be helpful." (Tr. 14.) When asked whether this theory would apply if Trantham were only a lookout, the Doctor added, "I was assuming that he knew there was a gun that would be used in this incident." (Tr. 15.)

Dr. Robertson testified that even if Trantham had committed no acts of violence, and had served only as a lookout, his participation in the robbery could have been the result of an excessive passivity characteristic of latent schizophrenia. (Tr. 28.) However, the Doctor conceded that this theory depended on an assumption that Trantham "was not the leader of the group." (Tr. 28.) Dr. Robertson had already testified that Trantham was of good intelligence (Tr. 21), and by and large was perceptive (Tr. 22). He was a "loner" (Tr. 22–23). The Doctor stated further that he did not know precisely what role Trantham had played, but merely *assumed* that Trantham had not been the leader. (Tr. 24.) He admitted it would have been helpful in determining Trantham's role "to have interviewed or to have some

knowledge of his alleged co-conspirators in this parking-lot offense." (Tr. 23.)

The possibility of other reasons for Trantham's participation was also brought out on cross-examination. Dr. Robertson testified that Trantham was a narcotic addict and might have been under the influence of narcotics on the night in question. When the court asked whether Trantham's reason for going along might have been a desire for money to buy drugs, as well as passivity and lack of appreciation of violence, the Doctor responded, "I think that all of these factors were operating at the same time." (Tr. 15.) Later, the court asked, "And you think it was the passivity, not the drugs, that made him go along with this group? Or was it drugs?" (Tr. 29.) Doctor Robertson again answered, "In my opinion, [it] could be both." (Tr. 30.) He went on to explain that the use of drugs could also account for Trantham's excessive passivity: "I think the person can be passive while they are under the influence of drugs. It makes them more relaxed, less aggressive than is usually considered. Narcosis causes a person to be more relaxed and more passive rather than aggressive." (Tr. 30.)

The prosecutor also brought out that Dr. Robertson's diagnosis was based to some extent on an incident at Lorton, which took place after the robbery, in which Trantham had assaulted another man with an iron bar while he was sleeping. Doctor Robertson regarded this incident as evidence of a violent character (Tr. 11), and stated on direct that it was probably due to a delusion on Trantham's part that his victim was going to hurt him. (Tr. 7.) At the time he made his initial report, however, Dr. Robertson thought there was no ulterior motive to the attack. (Tr. 18.) He stated that he had since become aware of the information, from an inmate, that Trantham knew the assaulted man from previous narcotics deals, that the man apparently owed Trantham some money, and that this might have accounted for the attack. (Tr. 19.) Doctor Robertson stated that

the presence of this motive would not change what he found from examining the patient. (Tr. 19.) Later, however, the Doctor agreed that if there was a motive, "he may very well not have acted on delusions." (Tr. 24.) When the prosecutor again sought to consider the significance of the possibility that in the Lorton incident "there may very well have been a motive," defense counsel objected that the question made an assumption as to facts not subject to cross-examination. The Court said (Tr. 24/5): "That is the nature of one of these proceedings. The doctor is also relying on a lot of other facts nobody can test as to their accuracy. We are trying it to the court." (Tr. 24/5.)

Contrary to Judge Bazelon's suggestion, Dr. Robertson's testimony did not amount to a straightforward linking of Trantham's illness to his crime, but only to an opinion that, *assuming certain facts to be true,* productivity might have been present. Dr. Robertson emphasized passivity and violence as the two most important outgrowths of latent schizophrenia, and varied his estimate of productivity according to how well Trantham's role in the robbery might have fit these characteristics. Thus, his finding of a pattern of violence in Trantham's behavior rested on the explicit assumption that Trantham had served as more than a lookout and had known that a gun would be used during the robbery. The Doctor also stated that Trantham's participation was probably characteristic of his excessive passivity, but this in turn depended on whether Trantham had acted as leader of the group, a fact which Dr. Robertson could not determine. Moreover, Dr. Robertson recognized that other factors could play a part in Trantham's actions generally, as in the Lorton incident, and that his use of drugs—if indeed he did use drugs on the night of the robbery—could have led to his participation.

It is in light of these possibilities that we must consider the District Judge's statement, expressing difficulty in relating appellant's disease to his conduct.

He was confronted with the issue—whether these actions by this defendant were the product of his mental disease. The Government had offered some evidence that they were not; Dr. Strawinsky's testimony was weak, to be sure, but the court was entitled to take it into account in resolving the issue. Dr. Robertson countered this evidence by showing how, in theory, Trantham's participation might have been linked to his disease. But in order to convert those theories into findings of fact, the court had to have some basis for deciding the validity of the factual assumptions on which the theories were based. The jury's verdict could not supply that basis, since it showed only that Trantham was involved in the robbery, but not how. Thus it was up to the defendant to produce evidence, either on his own or through other sources, concerning his role in the robbery, in order to lay a foundation for the testimony on productivity.

The District Judge's statement does not make confession by defendant a prerequisite to the insanity defense, nor does it confuse the functions of psychiatrist and fact-finder. It is simply a frank and realistic recognition of the problems that beset the finder of fact once the psychiatrist's theories have been laid before him. There must be some way to link those theories to the case at hand, at least where there is affirmative Government evidence of non-productivity.

I don't think the case merits en banc, even if we retain the productivity rule. The fact that this test is being reconsidered in the case of Archie Brawner is additional reason for denying en banc consideration.

Statement of Chief Judge BAZELON as to why he would grant rehearing *en banc.*

BAZELON, Chief Judge:

This record raises substantial questions concerning the administration of the insanity defense in this jurisdiction, questions concerning the burden of proof, the role of the expert witness, and the

rights of defendants who refuse to confess. Although appellant raised these points below and assigned them as error on appeal, they are not even discussed by the panel opinion. In view of the fact that this court is presently reconsidering *en banc* the language that defines our test of criminal responsibility, it is especially important for the court to consider as well these more fundamental questions, which will recur no matter what language is used to state the test of responsibility.[1] Accordingly, I would grant rehearing *en banc* in this case.

## I

After a jury found that appellant had participated in the robbery, the issue of insanity was tried to the judge, sitting without a jury. The only evidence on the issue came from two psychiatrists on the staff of St. Elizabeths Hospital.[2]

Dr. Robertson, who testified for the defense, had examined Mr. Trantham when he was originally committed to the Hospital for observation before trial. His conclusion, summarized in the letter sent by the Hospital superintendent to the court, was that Mr. Trantham "was suffering from Schizophrenia Latent Type and the offense if committed by him was a product of his mental illness."[3] At trial, Dr. Robertson presented his findings in somewhat less conclusory form. He stated that latent schizophrenia would impair the patient's judgment, change his value system, and permit him to commit offenses against others.[4] The doctor identified as particularly relevant to the crime two principal characteristics of Mr. Trantham's illness. First, he was abnormally passive, and consequently very vulnerable to the suggestions of others, a significant fact because the crime charged was committed

1. The court en banc is reconsidering its test of criminal responsibility in United States v. Brawner, No. 22,714. For the argument that problems in the administration of the insanity defense are far more important than the language of the test itself, see Brief for Prof. David Chambers as Amicus Curiae, United States v. Brawner (lodged June 28, 1971).

2. The defendant was committed to the Hospital on his own motion, for a pretrial mental examination relating both to his competency to stand trial, and to his criminal responsibility for the act charged. D.C.Code § 24–301(a) ; Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326 (1959), cert. denied, 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961).

3. This conclusory statement is the complete discussion of the issue of criminal responsibility contained in the report that the Hospital filed with the court before trial. We have in the past criticized the conclusory language of the reports routinely filed by the Hospital. *E. g.,* Holloway v. United States, 119 U.S.App.D.C. 396, 398–399, 343 F.2d 265, 267–268 (1964) ; *see* Judicial Conference of the District of Columbia Circuit, Report of the Committee on Problems Connected With Mental Examination of the Accused in Criminal Cases, Before Trial 36–39, 118–124 (1966) [hereinafter cited as Judicial Conference Report]. It is particularly

troublesome that, in dealing with the issue of criminal responsibility, the reports continue to use the conclusory term "product", tracking the language of the legal test of responsibility. ("[A]n accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." Durham v. United States, 94 U.S.App.D.C. 228, 239–240, 214 F.2d 862, 874–875 (1954)). In 1967, this court expressly held that the term "product" defines the ultimate issue of criminal responsibility, which is reserved for the factfinder, and we prohibited psychiatrists from stating direct conclusions on that issue. Washington v. United States, 129 U.S.App.D.C. 29, 40–41, 390 F.2d 444, 455–456 (1967). Since that time, the Hospital's summary reports have continued to state conclusions on productivity. That seeming indifference of the Hospital to *Washington* is perhaps partly attributable to the fact that the district court continues to commit defendants to the Hospital for examination with a standard order that erroneously calls for conclusions on the question of productivity.

4. He also explained that "latent" or "borderline" schizophrenia is a condition in which the patient chronically shows clear symptoms of schizophrenia, including delusions and withdrawal, but without sudden episodes in which he loses contact with reality.

by a group of people acting together. Second, he was abnormally preoccupied with violence, against himself or others, a significant fact because the crime was a direct personal attack in which a gun was used.[5]

In rebuttal, the government offered the testimony of Dr. Strawinsky, who was called into the case after the original examination and after the first part of the bifurcated trial. At that point the court remanded Mr. Trantham to the Hospital for further examination, and ordered the Hospital to hold a staff conference.[6] To comply with that order, Dr. Strawinsky reviewed the patient's records, interviewed him, and conferred with Dr. Robertson. She agreed with his diagnosis of latent or borderline schizophrenia, but she had "no valid opinion as to productivity in regards to a charge of robbery." [7] At trial she explained that she was cautious about finding productivity in cases of group behavior; she thought participation in a group crime was "somewhat incompatible" with Mr. Trantham's illness because he was a "loner", but she insisted that she had no valid or substantial information either way on the question of productivity.

On the basis of this evidence, the trial judge found that the government had proved beyond a reasonable doubt that the appellant's act was not the product of mental illness. Because Dr. Strawinsky's testimony was so tentative and inconclusive, I might well take a different view of the evidence. Nevertheless, I would not on that basis alone ask this court *en banc* to review the simple question of sufficiency of the evidence, if the verdict had been rendered by a properly instructed jury, or if the judge as factfinder had indicated that he was applying correctly the controlling principles of law. For as we have said so many times, the question of criminal responsibility involves an intricate mixture of medical, legal, and moral elements, and the resolution of that question is very difficult for an appellate court to review.[8]

In this case, however, the record indicates that the trial judge made findings which, as a matter of law, amount to a reasonable doubt on the issue of responsibility. To affirm this conviction in the face of those findings is to emasculate the rule that the government has the burden of proving criminal responsibility beyond a reasonable doubt.[9] That rule

---

5. In response to a question from the trial judge, Dr. Robertson advanced another theory by which the illness might have been related to the crime. The judge suggested that Mr. Trantham might have participated in the robbery not because of his passivity and lack of appreciation for violence, but because he wanted money for drugs. Dr. Robertson responded that "all of these factors were operating at the same time." The judge, pursuing the drug factor, asked whether Mr. Trantham's interest in drugs was itself related to his mental illness. Dr. Robertson explained that Mr. Trantham's schizophrenia produced great anxiety and fear of being harmed by others; heroin would provide relief for that anxiety. Appellant placed no substantial reliance on this theory, however, and we have no occasion to decide whether in a proper case an insanity defense could rest on a chain of causation running from illness through addiction to robbery. *Compare* United States v. Carter, 141 U.S.App.D.C. 46,

55, 56, 436 F.2d 200, 209–210 (1970) (concurring opinion).

6. For a discussion of the role of the staff conference in the pretrial mental examination at St. Elizabeths Hospital, and the power of a court to order that such a conference be held, *see* Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969).

7. This statement is taken from the report filed by the Hospital after the second examination; the report also reiterated Dr. Robertson's findings, which remained unchanged, *see* p. 1041 & n. 3 *supra.*

8. *See, e. g.,* United States v. Eichberg, 142 U.S.App.D.C. 110, 439 F.2d 620 (1971) ; Adams v. United States, 134 U.S.App. D.C. 137, 142, 413 F.2d 411, 416 (1969) ; King v. United States, 125 U.S.App. D.C. 318, 324, 372 F.2d 383, 389 (1967).

9. The federal rule since 1895 has been that once a criminal defendant has raised the issue by introducing "some evidence" of insanity, the burden is on the govern-

has recently been changed, by a statute enacted after the trial of this case and not applicable to it.[10] Since I have grave doubts about the constitutional validity of that statute,[11] I find in the statute an additional argument in favor of confronting the important questions presented by this record.

The judge found that Mr. Trantham was suffering from a serious mental illness, and did not question the experts' explanation of the principal characteristics of the illness. His doubts centered on the issue of "productivity", or the causal connection between the illness and the crime:

> My difficulty is not that this man hasn't got a mental problem, but I find it difficult to know how I can relate his disease to his conduct when in effect he is saying I didn't do it. He is not only saying it to the jury, but he is saying it to the psychiatrists. If he didn't do it, how could his mental illness have affected his doing it? Now that is my problem and I am putting it to you frankly because that is where I am stuck.

On the basis of that statement, it appears that the trial judge had formulated a rule requiring a defendant to admit his guilt, at least to the psychiatrists, as a condition of raising the insanity defense. The judge may have regarded the lack of such a confession as a deficiency in the evidence before him as factfinder. Alternatively, he may have regarded the lack of a confession as a deficiency in the information before the psychiatrist, undermining the validity of the psychiatrist's conclusions. In either case, serious questions are raised by the view that a defendant's refusal to confess may defeat his insanity defense.

## II

1. Although Dr. Robertson had explained several ways in which the illness might have led to unlawful behavior, it is suggested that the trial judge was unable to relate the doctor's analysis to the facts of the crime, because he lacked sufficient information about Mr. Trantham's role in the robbery. It would undoubtedly have been helpful to know whether Mr. Trantham had been a leader or a follower in the group activity, in order to relate his conduct to the testimony about "passivity"; likewise it would have been helpful to know whether Mr. Trantham had anticipated violence or the use of a gun. Because of his uncertainty on these points, the trial judge concluded that the defendant had failed to make a showing of productivity.

The error in that conclusion lies in the fact that the law did not require the defendant to prove productivity; it only required him to raise a reasonable doubt. There was no evidence that Mr. Trantham's role in the robbery was inconsistent with the passive and violence-prone features of his illness; the judge was simply unable to determine whether it was consistent or inconsistent.[12] In

ment to prove responsibility beyond a reasonable doubt. Davis v. United States, 160 U.S. 469, 484, 16 S.Ct. 353, 40 L. Ed. 499 (1895); Tatum v. United States, 88 U.S.App.D.C. 386, 389–391, 190 F.2d 612, 615–617 (1951).

10. The District of Columbia Court Reform and Criminal Procedure Act of 1970 § 207(6), 84 Stat. 602, added the following language to D.C.Code § 24–301(j): No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence.

11. See United States v. Eichberg, 142 U. S.App.D.C. 110, 114, 439 F.2d 620, 624 (1971) (Bazelon, C. J., concurring).

12. Ordinarily no evidence concerning the facts of the crime itself is introduced at the second part of a bifurcated insanity trial. The parties assume that the facts of the crime have been established with sufficient precision at the first part of the trial. There is of course no reason why the trial judge should not call for such evidence, if a critical point about the crime remains ambiguous. If no such evidence is forthcoming, however, the resulting ambiguity must be resolved in

effect, then, he entertained a reasonable doubt on the issue of criminal responsibility, and he was accordingly obliged to enter a verdict of not guilty by reason of insanity.

2. Moreover, it is troublesome that a critical factor in the trial judge's determination was Mr. Trantham's steadfast refusal to admit his guilt. The judge emphasized the fact that the defendant had admitted the crime neither to the court nor to the psychiatrists, even after a jury had found that he participated in the robbery.

The defendant's silence in court, of course, was constitutionally protected, and could not support any inferences adverse to him, in connection with either his defense on the merits or the insanity defense.[13] It may be that his refusal to confess to the psychiatrists was not similarly protected. That is, if a psychiatrist thought it significant that he declined to confess, and persisted in his alibi, perhaps the expert could so testify. Similarly, if a psychiatrist thought the defendant was withholding information critical to an adequate psychiatric evaluation, perhaps that too could be the subject of testimony.[14] But no such testimony was offered in this case. Without any support in expert opinion, the judge apparently concluded that Dr. Robertson had an inadequate basis for his evaluation, because Mr. Trantham had refused to admit and discuss his crime with the doctor.

In effect, then, the judge made confession by the defendant a condition of raising an insanity defense with any substantial likelihood of success. Such a rule imposes a heavy and unnecessary burden on the right to raise the defense.

The same mental illness which led the defendant to commit his crime might also make it difficult or impossible for him to admit it, to a psychiatrist or to anyone else. A mentally ill defendant might honestly believe he did not participate in the crime, or he might be unable to confront openly what he knows to be true. It would be an intolerable injustice to strip such a defendant of the defense grounded in his disability.

3. Furthermore, there is no reason to impose such a harsh penalty on the defendant who denies the offense. The expert's role is to explore the defendant's mental condition, and explain it to the factfinder, explaining in general how that mental condition could affect the defendant's behavior. A defendant might frustrate the psychiatrist's attempt to explore his mental condition by refusing to talk at all, or by refusing to discuss matters the psychiatrist regards as critical. But there is no reason to suppose, without supporting testimony from the psychiatrist, that the defendant frustrates the examination by giving his own version of the events in question, i. e., by persisting in his alibi.

After a jury has found that the defendant participated in the crime, the psychiatrist must assume that he did so, even though he denies it, for the purpose of appraising the possible relationship between his participation and his mental illness. It is not for the psychiatrist to question whether the offense actually occurred. His role is only to explain how the defendant's mental condition might be related to the offense, assuming that it occurred as found by the factfinder.

---

favor of the defendant, in light of the government's burden of proving responsibility beyond a reasonable doubt.

13. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); cf. 18 U.S.C. § 3481 (1964). The defendant's decision not to testify is protected even when the only issue at stake is criminal responsibility. Stewart v.

United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961).

14. On the general problem of the defendant who refuses to cooperate with the examining psychiatrist, see Lee v. County Court, 27 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452 (1971); Judicial Conference Report, supra note 3, at 107–118.

In this case Dr. Robertson's testimony on the issue of productivity was based on various hypotheses about the facts surrounding the defendant's participation in the offense. The trial judge objected to the hypothetical character of the testimony.[15] But this court called for precisely that kind of testimony in Harried v. United States, 128 U.S.App.D.C. 330, 334 n.3, 389 F.2d 281, 285 n.3 (1967) (Burger, J.). The psychiatrist is properly concerned not with the facts of the crime, but with the defendant's mental condition. Only the factfinder, and not the psychiatrist, is permitted to consider whether that condition did in fact contribute to the specific crime in question. Washington v. United States, 129 U.S. App.D.C. 29, 40–41, 390 F.2d 444, 455–456 (1967). Consequently, the psychiatrist needs neither objective information about the crime nor the defendant's version of it in order to provide relevant testimony about the defendant's mental condition. To conclude otherwise is to confuse the role of the psychiatrist with that of the factfinder.

### III

As I have said before, "our problems are not solved by sweeping them under the rug of a doctrine that saves our face by hiding our troubles. If they are to be solved at all, they must first be brought into the open for confrontation." [16] In order to give the questions raised by this record the attention they require, instead of sweeping them under the rug, I would grant rehearing *en banc*.

---

15. THE COURT: * * * [Dr. Robertson] had to say, if he was doing it in order to get drugs, he had to get drugs because he was sick, and if he wasn't doing it because he had to get drugs, he was doing it because he was passive. Without any facts—and in no criticism of the doctor—he has to engage in a series of somewhat contradictory or at least different suppositions.

[DEFENSE COUNSEL]: Well, Your Honor, I think that Dr. Robertson, in taking these suppositions, said a person with this latent schizophrenia, how would he have been involved in this? He was a follower. He stated that Mr. —

THE COURT: He might have been. He might have been.

16. United States v. Carter, 141 U.S.App. D.C. 46, 57, 436 F.2d 200, 211 (1970) (concurring opinion).