UNITED STATES of America, Appellee,

v.

**Francisco Martin DURAN, Appellant.**

No. 95–3096.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 4, 1996.

Decided Oct. 8, 1996.

---

A.J. Kramer, Federal Public Defender, Washington, DC, argued the cause and filed the briefs for appellant. Leigh A. Kenny, Assistant Federal Public Defender, entered an appearance.

Leslie A. Blackmon, Assistant United States Attorney, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Brenda J. Johnson and Chrisellen R. Kolb, Assistant United States Attorneys, were on the brief.

Before: WALD, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

On April 4, 1995, a jury convicted Francisco Martin Duran of ten criminal counts, all of which centered on the fact that on October 29, 1994, at around 3:00 in the afternoon, Duran stood on the Pennsylvania Avenue sidewalk in front of the White House and fired at least twenty-nine rounds across the North Lawn with an assault weapon. On appeal, the defendant challenges his convictions on three grounds. First, Duran claims that the district court erred by failing to bifurcate the trial for separate presentation of his merits and insanity defenses. Second, Duran asserts that his actions on October 29, 1994, did not render him guilty of attempting to assassinate the President of the United States under 18 U.S.C. § 1751(c). Third, Duran claims that there was insufficient evidence presented at trial to support his conviction under 18 U.S.C. § 111 for "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" four Secret Service officers who were present on the North Lawn of the White House as he was shooting. We find merit in none of these claims, and affirm Duran's convictions.

The district judge did not abuse his discretion by denying Duran's motion to bifurcate the trial, because the defense had not demonstrated that the merits and insanity defenses were so incompatible as to require bifurcation. Nor did the joint presentation of the merits and insanity defenses at the trial result in prejudice making remand for a new bifurcated trial necessary, because the two defenses were not in fact incompatible. Duran violated § 1751(c) by engaging in a series of "substantial steps" towards his goal of killing the President in the days and hours leading up to the afternoon of October 29, 1994. We also uphold Duran's convictions under § 111 because, viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have concluded beyond a reasonable doubt that as the defendant ran east along the White House fence, spraying gunfire across the North Lawn, he acted with the purpose of putting Secret Service agents on the North Lawn in fear of imminent serious bodily harm.

## I. Background

In mid-September of 1994 Francisco Martin Duran, a 26-year-old upholsterer from a suburb of Colorado Springs, Colorado, began to purchase a number of assault weapons. Evidence presented at trial established that on September 13, Duran bought an assault rifle and about 100 rounds of ammunition. Two days later, he bought a thirty-round clip and had the rifle equipped with a folding stock. Thirteen days after that, Duran bought a shotgun, and the following day still more ammunition. On September 30, Duran left work and, without contacting his family or employer, began his journey to Washington, D.C. He purchased another thirty-round clip in Charlottesville, Virginia on October 10, and the next day bought a large overcoat in Richmond, Virginia. Later that day Duran arrived in Washington, D.C., and checked into a hotel. He stayed at various hotels in the Washington area between the tenth and the twenty-ninth of October.

Shortly before 6:00 on the morning of October 29, Duran checked out of the Embassy Suites Hotel in Tysons Corner, drove to downtown Washington, and parked his truck on 17th Street, between D and E Streets. By early afternoon, he was standing in front of the north side of the White House, wearing the overcoat he had purchased earlier on his trip. As Duran stood by the White House fence, two eighth-grade students on a field trip, Robert DeCamp and Brent Owens, ran to a point along the fence thirteen feet away. DeCamp pointed toward a small group of men in dark suits standing near the White House. One of these men, civilian Dennis Basso, bore a strong resemblance to President Clinton. DeCamp remarked that the man "looked like Bill Clinton," and Owens said "Yeah, it does." Almost immediately after this exchange, Duran began firing the rifle at Basso.

Four Secret Service officers who were stationed on the north side of the White House reacted to the sound of shots by taking cover and attempting to move toward the source of the gunfire. After firing about twenty rounds from his original position, Duran began running east along the fence, continuing to fire in the direction of the White House. Then he stopped, apparently trying to reload a second thirty-round clip—at this point civilian Harry Rakowsky tackled him, and soon thereafter several Secret Service agents arrived to help subdue Duran and confiscate his rifle.

Searching his truck after his arrest, agents found one of the rifles Duran had purchased en route to Washington, several boxes of ammunition, nerve gas antidote, a letter in which Duran had written "Can you imagine a higher moral calling than to destroy someone's dreams with one bullet?," a road atlas on which Duran had written "Kill the Pres!," a cover torn from a telephone book bearing a picture of President Clinton, which Duran had defaced by drawing a circle around Clinton's head and an "X" on his face, a handwritten document with the heading "Last will and words," an order form for the book "Hit Man," and several books about out-of-body experiences. When they searched his house and office, law enforcement agents found a business card on the back of which Duran had written "Kill all government offices (sic) and department heads" and assorted other pieces of anti-government literature.

## II. DISCUSSION

### A. Failure to Bifurcate the Trial for Separate Presentation of Merits and Insanity Defenses

The defendant claims that the district court abused its discretion by denying his pretrial motion to bifurcate the trial into two phases dealing separately with the issues of guilt and sanity. We find that the district judge was within his discretion in denying Duran's motion to bifurcate, and that the court's failure to bifurcate the trial resulted in no unfair prejudice to either of Duran's defenses.

#### 1. Denial of Duran's Motion to Bifurcate the Trial

Circuit law holds that a defendant should have the opportunity to benefit from both a merits-based defense and an insanity defense even when these defenses are incompatible, and thus the court should bifurcate a trial for separate presentation of these two defenses if it appears likely that either would be adversely affected by a jury hearing evidence regarding the other. *Holmes v. United States,* 363 F.2d 281 (D.C.Cir.1966); *Contee v. United States,* 410 F.2d 249 (D.C.Cir. 1969). District judges must consider the possibility of such prejudice in exercising their discretion to grant or deny a motion to bifurcate, and the motion should be granted when the potential for such prejudice is apparent at the outset; that is, when the defendant demonstrates that he has "substantial," and incompatible, defenses on both the merits and insanity issues. *See Contee,* 410 F.2d at 250.

Before trial, Duran made a motion to bifurcate pursuant to which the parties would first try the issue of Duran's guilt on the merits, and then, if the jury found him guilty, proceed to a second "phase" in which Duran would present an insanity defense. Duran also requested, but did not condition his bifurcation request upon, the impanelment of two separate juries to hear the two different phases of the case.

To show that he was prepared to offer a "substantial" defense on the merits, Duran's counsel notified the court that he intended to prove that Duran shot toward the White House as part of a "dramatic suicide mission," rather than as part of an attempt to kill the President or anyone else. The defense described the evidence it would use in support of this theory: the defendant's disintegrating marriage, his financial troubles, statements he made to his wife just before the incident indicating that he thought she would never see him again, a note with the heading "Last will and words" found in his truck just after the shooting, his statement to the agents arresting him that he wished they had shot him, the low accuracy of his chosen weapon and his careless manner of firing it, and the testimony of doctors indicating that he was suicidal.

The evidence the defendant proffered to the court in order to show that he would offer a "substantial" insanity defense, and that this defense would be incompatible with his merits defense, included a handwritten paean to murder that he had written before the shooting, and reports by two psychiatrists and a psychologist describing him as a paranoid schizophrenic.

In denying the bifurcation motion, the court noted that "the caselaw does not provide a clear definition as to what constitutes a 'substantial defense,'" but added that a defense is not "substantial" when it consists merely of "putting the Government to its proof," or when the government's case is so strong that it would be "irrational" to suppose that the proffered defense could sway a jury. *United States v. Duran,* 884 F.Supp. 529, 531–32 (D.D.C.1995) (quoting *United States v. Grimes,* 421 F.2d 1119, 1123 (D.C.Cir.), *cert. denied,* 398 U.S. 932, 90 S.Ct. 1831, 26 L.Ed.2d 98 (1970)). The court found that neither Duran's merits defense nor his insanity defense could be considered "substantial" in light of the strength of the evidence the government intended to introduce at trial. The government had indicated that it would offer two videotapes of Duran firing toward the White House, and would call three experts who would rebut the testimony of Duran's three experts by testifying that Duran was not suffering from a severe mental disorder, and that Duran was in fact feigning insanity. The court further rea-

soned that, notwithstanding any question of the "substantiality" of the two defenses, bifurcation was unnecessary because the two defenses were mutually-reinforcing, rather than contradictory.

■ The district court correctly asserted that our caselaw has not heretofore articulated a precise definition of "substantiality" in the context of this type of bifurcation decision. In *Harried v. United States,* we stated that a simple denial, by which the defendant merely "puts the government to its proof," does not qualify as a "substantial" defense. *See Harried v. United States,* 389 F.2d 281, 284 (D.C.Cir.1967). But as the defendant there had offered only a bare denial of guilt, we found it unnecessary to determine just how much further a defendant must go in showing the court that he has a potential defense in order to cross the threshold into "substantiality."

In *Contee,* this court went a bit further in discussing the "substantiality" of two defenses proffered by a defendant who had been convicted of murdering his wife with an ax. The trial court had denied Contee's pretrial bifurcation motion, based on two defenses, one self-defense and the other lack of premeditation. *Contee,* 410 F.2d at 250. Contee's proffered self-defense theory was based exclusively on his own testimony that all he remembered about the event was waking up to find his wife on top of him and blood spurting from cuts on his arms, then pushing his wife off, seeing a "devil" standing over his wife, and passing out. *Id.* at 251. On appeal after Contee's conviction, this court held that the trial court was within its discretion in denying Contee's pretrial bifurcation motion. After reviewing the evidence Contee had proffered in support of his self-defense theory, we concluded: "[i]t is doubtful that this evidence would have required an instruction on self-defense had one been requested. In any event, we think it is too insubstantial to warrant reversal for lack of bifurcation in the circumstances of this case." *Id.* at 251. The *Contee* court thus suggested that a defense which appears extremely weak or implausible, although it goes beyond merely "putting the government to its proof," may be considered "insubstantial." Contee had also prof-

fered, in his pre-trial bifurcation motion, the defense of lack of premeditation, which he proposed to support with the same testimony regarding his memory of the events surrounding his wife's death. *Id.* This court noted as to that defense that "[t]he Government's evidence of premeditation, though sufficient, was relatively weak, and [Contee's] testimony, if believed, negated any consciously formulated design to kill his wife," and so the proffered premeditation defense was "substantial." *Id.*

Fortunately we need not, even if we could, articulate a precise definition of the requirements of "substantiality" in order to decide this case; it is sufficient to note that the central concern underlying the relevant bifurcation cases is the danger that prejudice to a defendant could result from the unitary structure of the trial. That is, our bifurcation cases dealing with defendants who proffer both merits and insanity defenses suggest that a trial judge should not allow the manner in which different defense theories are presented at trial to affect the outcome of the trial. By breaking the bifurcation determination down into the subsidiary questions of the "substantiality" and "compatibility" of various defenses, we endeavor to ensure that any plausible and supported defense will be given a chance to stand on its own. We do not thereby intend, however, on the one hand to mandate bifurcation when defendants proffer only flimsy and patently unsupportable defenses or, on the other, to require trial judges to conduct mini-trials in order to determine how proffered defenses may fare at trial. Trial judges must exercise their sound discretion in deciding whether to satisfy bifurcation requests, based on the information presented to them by the parties and any other information reasonably available to them at the time bifurcation is requested. Such discretion will generally weigh in favor of bifurcation only when "a defendant shows that he has a substantial insanity defense and a substantial defense on the merits to any element of the charge, either of which would be prejudiced by simultaneous presentation with the other." *Id.* at 250.

In assessing Duran's proffered merits and insanity defenses, the trial court may have

applied too daunting a "substantiality" standard. With regard to Duran's merits defense, the court observed that the government was prepared to show the jury two videotapes of Duran firing a rifle toward the White House, and on this basis concluded that "any defense to the acts depicted in the video tapes cannot be substantial." *Duran,* 884 F.Supp. at 532. The problem with this rationale is that Duran did not propose to deny committing the acts depicted in the videotapes; rather, Duran proffered a merits defense premised on an assertion about his state of mind while committing those acts. The court dealt with Duran's insanity defense in one sentence, explaining "[n]or can the Court hold that the Defendant presents a substantial insanity defense, as the Government also intends to call at trial two psychologists and one psychiatrist to rebut the testimony presented by the Defendant on this issue." *Id.* Given that the parties intended to present an equal number of experts on the insanity issue, such a terse determination of "insubstantiality" resembles a mere guess at which side's experts would appear more credible to the jury.

On this record, we would hesitate to uphold the trial judge's refusal to bifurcate had he based his decision solely on his determination that Duran's proffered defenses were "insubstantial," but we find the court's conclusion that these defenses also were not fundamentally incompatible compelling enough to support the refusal to bifurcate the trial without recourse to the question of "substantiality." The trial court here noted that, in *Contee,* this court upheld a denial of a motion to bifurcate when the evidence proffered in support of the insanity theory served to bolster, rather than to undermine, Contee's merits defense of lack of premeditation. *Id.* at 532–33. In making this determination, the *Contee* court concluded that "much of [the testimony offered in support of the in-

sanity defense] in fact gave substance and plausibility to appellant's claim that he killed impulsively and without premeditation," and declared itself "unable to determine with any confidence whether appellant was on balance helped or hurt" by the cross-pollination of these two defenses. *Contee,* 410 F.2d at 251–52. The *Contee* court recognized that, in ruling on a bifurcation motion, "the court must depend largely on defense counsel for the relevant information," and thus a trial judge may deny the motion when the defendant has failed to convince him of both substantiality and incompatibility.[1] *Id.* at 250–51.

This trial court was similarly unable, when faced with the pretrial bifurcation motion, to determine whether Duran would on balance be helped or hurt by the presentation of his merits defense in tandem with his insanity defense. *See Duran,* 884 F.Supp. at 532–33. The proposed merits defense was based on the theory that Duran shot toward the White House, not with the intention of killing the President or anyone else, but with the intention of attracting fatal return fire from security agents. The proposed insanity defense theory posited that Duran shot towards the White House, not with the intention of killing the President or anyone else, but with intention of killing an "evil mist" that his paranoid schizophrenia made him believe was hovering over the White House. The cornerstone of each theory was the lack of an intent to kill any person; they differed primarily in regard to the particular form of mental aberration compelling Duran's actions, and the defendant did not suggest in his pretrial motions, nor does he argue before this court, that a suicidal mental state is fundamentally incompatible with paranoid schizophrenia. Thus the trial court could reasonably conclude that the evidence regarding Duran's emotional distress and possible death wish would, if anything, serve to "soften up" the

1. The *Contee* court also recognized that defense counsel may sometimes fail to adequately demonstrate the elements of substantiality and incompatibility even when one or both are present, and that this deficiency in the lawyer's performance may not always be so great as to afford the defendant the remedy of an action for ineffective assistance of counsel. *Id.* at 251. As a safety valve for such defendants, the *Contee* court

noted that "though not an abuse of discretion when made, the denial of a motion for bifurcation may nonetheless in some circumstances require reversal for a new trial." *Id.; see also United States v. Bennett,* 460 F.2d 872 (D.C.Cir. 1972). We discuss the question of whether a remand for a new, bifurcated trial is appropriate in this case in the next section of this opinion.

jury for the expert and other evidence offered in support of his insanity defense. In light of the reasonableness of this conclusion regarding the compatibility of the two proffered defenses, the denial of Duran's motion to bifurcate the trial was not an abuse of discretion.

### 2. Prejudice Resulting from the Failure to Bifurcate the Trial

■ Even though a trial court acted within its discretion in denying a pretrial motion to bifurcate, a showing of actual prejudice resulting from the failure to bifurcate may still require a remand for a new, bifurcated trial. *See Contee,* 410 F.2d at 251; *United States v. Bennett,* 460 F.2d 872 (D.C.Cir. 1972). In *Bennett,* this court held that the district judge exercised sound discretion in denying the pretrial bifurcation motion of a defendant charged with sexually assaulting a 13–year–old boy. Nevertheless, the court was deeply concerned about the effect that certain evidence presented at trial in support of the insanity defense might have had on Bennett's merits defense. At trial, Bennett had asserted both that he had not committed the acts charged and that he suffered from a severe mental illness that rendered him incapable of appreciating the wrongfulness of his acts. On appeal, Bennett claimed that the presentation of evidence relevant only to the merits issue had prejudiced his insanity defense, and vice-versa. The government's presentation of its case on the merits had allegedly prejudiced Bennett's insanity defense by exposing the jury to the "unpleasant details" of the crime, which this court agreed could make the jury "reluctant to find a defendant not guilty by reason of insanity if the crime at issue is especially heinous," and which the jury deciding the issue of Bennett's sanity would not have heard had Bennett's trial been bifurcated and used two separate juries, as he had requested. *Bennett,* 460 F.2d at 881. Bennett claimed that his insanity defense had prejudiced his merits defense because it had included the testimony of a government expert who recounted Bennett's virtual confession to the very acts he denied having committed. The doctor testified that he had concluded that the defendant was sane because the defendant had

a "very good recollection of the events of the alleged events. He recalls minutely what happened prior to the offense, of the alleged offense, and following it. He expressed his own version of the story, his feeling about it. . . ." *Id.* at 878. On appeal, this court observed that "it seems clear that the defense was, in fact, prejudiced by the admission of a confession which could obviously be expected to have an impact on the jury's determination of the merits." *Id.* at 879.

Duran complains of prejudice necessitating a remand for a bifurcated trial based on the prejudicial effect of several items of evidence elicited from witnesses in his trial; he claims that, in a bifurcated trial, these witnesses would not have testified unless and until his guilt had first been determined in the merits phase of the trial. He refers specifically to testimony regarding his prior conviction for drunk driving and aggravated assault, and testimony elicited from doctors regarding Duran's descriptions of himself, statements about wanting to kill the President, and his "gruesome and graphic" fantasy about killing and mutilating the President and First Lady. Brief of Appellant at 37.

#### a. Duran's Prior Conviction

■ In order to determine whether the introduction of Duran's prior conviction for drunk driving and assault represented unfair prejudice to his merits defense, we must first determine whether it would, in any case, have been introduced in the merits phase of a bifurcated trial. The process of constructing this hypothetical bifurcated trial requires a close look at the sequence and use by the parties of those witnesses responsible for the introduction of this evidence.

In the course of making its case against Duran for attempted murder of the President of the United States, the government called as witnesses David Millis and Stacy Stallwood, Duran's co-workers at the Broadmoor Hotel in Colorado Springs. Millis testified on direct examination that Duran "really hated taxes and basically the government," and that Duran had often talked about wanting to kill the President. Tran-

script ("Tr.") 3/21/95 at 14.[2] Stallwood testified that Duran "didn't want to have any government official telling him what to do," and that Duran had told her that "he hated [President Clinton] and if he had the chance he would kill him." Tr. 3/20/95 at 193. Duran's witnesses included several people who knew him when he served in the military, including former military superiors Ronald Beatty and Manuel Flores, and his father-in-law Wayne Warner. The defense's direct examination of each witness followed a virtually identical pattern: after introducing the witness and establishing his relationship with Duran, the defense asked some variant of these two questions: "did [Duran] ever say anything unusual to you about the United States government?" and "did [Duran] ever talk to you about killing or harming the President?" Tr. 3/27/95 at 14, 37–38, 54. Each of these witnesses answered "no" to both questions. In a sidebar conversation following the direct examination of Beatty, Duran's counsel said that her purpose in calling Beatty was to impeach Stallwood and Millis on the merits issue of Duran's desire to kill the President.[3]

For reasons that are unclear from the record, Duran's own counsel elicited the fact of his prior conviction. The parties had previously agreed that the fact of Duran's dishonorable discharge from the military, which resulted from his conviction, would be admissible, but that neither side would seek to introduce the fact of the conviction. The government elicited the fact of the discharge from Flores, but did not elicit the conviction that underlay the discharge; rather, Duran's counsel elicited testimony describing the conviction on direct examination of Duran's father-in-law, Wayne Warner.

Duran now claims that "neither Flores nor Warner would have been called during the merits phase of a bifurcated trial, as their evidence went only to the sanity issue," and therefore the fact of Duran's prior conviction would not have been heard by the jury in a separate merits phase of a bifurcated trial. Reply Brief of Appellant at 4. It is not readily apparent, however, that the testimony of Flores and Warner would have had *any* value to Duran in his presentation of a separate insanity defense. Flores testified that he had never heard Duran say unusual things about the government or about wanting to kill the President, and that "Duran was a very good man when he was under me." Tr. 3/27/95 at 41. Warner's testimony was similar, referring to Duran as being "a little bit unhappy with the government, because he couldn't change it." Tr. 3/27/95 at 54–55. Overall, the testimony of Flores and Warner suggested that Duran was well able to understand the wrongfulness of firing an assault weapon across the North Lawn of the White House.

At oral argument in this court, defense counsel elaborated somewhat on the assertion that Flores and Warner would not have been called until the insanity phase of a bifurcated trial, suggesting that the defense had intended to use these witnesses only to help prove that Duran was insane, by demonstrating the radical *change* in Duran's mental state between his time in the military and his time as an upholsterer at the Broadmoor Hotel. The record does, in fact, provide some support for this assertion. The defense delivered two separate closing arguments, the first summarizing Duran's merits defenses and the second his insanity defense; the second closing argument used the testimony of people who knew Duran from his military service to demonstrate the radical change in his mental state that had taken place by the time of the shootings. It seems unclear to us, however, that the defense would have used Flores and Warner *solely* to set the scene for its narrative description of Duran's descent into madness in a bifurcated trial. The intuitively much stronger reason for calling Flores and Warner—to rebut government witnesses on the merits issue of Du-

---

2. The transcript of Duran's trial is composed of several separately-paginated volumes, each of which includes the testimony from a particular day. For this reason, references to the transcript indicate both the date of the testimony and the page on which it appears.

3. "The questions that I asked were about what Duran said about the government and directly contradicts what Stacy Stallwood and David Millis said that Mr. Duran's attitude was at the time, that he hated the government, that he wanted to kill the President...." Tr. 3/27/95 at 19.

ran's desire to kill the President—was the one actually articulated at sidebar by defense counsel during the trial.[4] Furthermore, the first defense closing argument, dealing with Duran's defenses on the merits, reflected a strong desire on the defendant's part to undermine the testimony of Stallwood and Millis regarding his statements about killing the President.[5]

Finally, even if the defense had intended to save Flores and Warner for the insanity phase of a bifurcated trial, and even if refusing to call these two as defense witnesses in the merits phase could have prevented the jury from hearing about the prior conviction, the overwhelming evidence presented at trial regarding Duran's hatred of the government and of the President, his announced desire to kill the President, and the extensive actions he took in pursuit of this desire, make it impossible for us to conclude that Duran's prior conviction for drunk driving and assault played a significant role in the jury's deliberations centering on Duran's attempt to assassinate the President. Therefore, we cannot conclude that the admission of testimony regarding the prior conviction represented unfair prejudice to his merits defense resulting from the failure to bifurcate the trial.

### b. *Testimony of Doctors Evaluating Duran*

■ Duran's claim that his merits defense was prejudiced by the insanity-related testimony of Doctors Rappeport and Phillips is a more substantial one. The government cross-examined defense witness Rappeport, and examined its own witness Phillips, regarding the substance of their notes from evaluation sessions with Duran. These notes recorded various statements Duran made to the doctors, including his description of himself as a "hateful" "pervert" and an anarchist opposed to government, his desire "to kill people in a way that might horrify others," and his fantasy about killing President Clin-

ton "by [his] hands, very privately, intimately." Tr. 3/29/95 at 43–45. Dr. Phillips related a fantasy Duran had described to him, in which Duran removes the First Lady's heart from her body and eats it in front of the President, then removes and eats the President's heart. Dr. Phillips also testified that Duran had a narcissistic and antisocial personality disorder, which he described as not a chronic or severe mental disturbance but rather a condition which made Duran "what we would characterize as not a very nice person, as a person who essentially will do things primarily for their own benefit.... [T]he kinds of individuals that we frequently find in courtroom settings because they not infrequently run aground with the law." Tr. 3/29/95 at 137.

This testimony admittedly bears a surface resemblance to the expert testimony that provided the basis for a remand in *Bennett.* In this case, however, the testimony at issue was far less likely to have unfairly prejudiced the defendant. This is because the defendant in *Bennett* denied having committed the physical acts with which he was charged, and the testimony Bennett objected to directly contradicted this defense by recounting his own statements describing how he felt while committing these physical acts. Duran, by contrast, does not deny that he stood in front of the White House and fired repeatedly across the North Lawn. The only contested issue was whether Duran committed these acts with the state and condition of mind required to convict him for the attempted assassination of the President and the other crimes which the defense contested.

In our discussion of the compatibility of the merits and insanity defenses, we noted that each of these defense theories began with the premise that Duran's state of mind as he fired his weapon was not that of an assassin acting out of hatred for the President and the government, and that each the-

---

**4.** *See supra* note 3.

**5.** The defense claimed in its first closing argument that Millis sold his story to the highest bidder, was smoking marijuana during the times that he claimed to have heard Duran make incriminating statements, had suspiciously been spared prosecution for using and possibly distrib-

uting marijuana, had a poor reputation for truthtelling, and made inconsistent statements to the FBI, and that Stallwood "had something personal against" Duran and gave testimony that was contradicted by Millis' testimony. Tr. 4/3/95 at 62–66.

ory was premised on the further assertion that Duran was afflicted with an abnormal mental condition that accounted for his severely aberrant behavior. The merits defense, summarized for the jury in the first defense closing argument, described Duran's mental condition as a delusional state which, regardless of whether it could be labeled a severe mental illness, precluded a finding that Duran had the intent to assassinate the President and to assault the four Secret Service officers named in the indictment.[6] The insanity defense, summarized in the second defense closing argument, categorized Duran's mental state as a severe mental illness rendering him incapable of appreciating the wrongfulness of his actions.[7]

The jury saw and heard extensive evidence about the defendant's obsession with the government and the President, including the testimony of Duran's co-workers at the Broadmoor who heard him say he "would kill Clinton if he had the chance," cards on which he had written such statements as "[t]ime to take our country back," a picture of the President on which he had drawn an "X" across the President's forehead, and a road atlas on which he had written, "Kill the Pres!" The jury heard evidence establishing that Duran had traveled from Colorado to Washington, D.C., purchasing weapons, ammunition, and a bulky overcoat along the way, until the day he parked near the White House, stood by the North Gate with the weapons and ammunition concealed under the overcoat, and then fired at a man who looked a lot like the President.

All of this evidence must have strongly pulled the jury toward the same conclusion reached by Doctors Rappeport and Phillips—

that Duran's mental state was dangerously abnormal and that he had an unhealthy and hostile obsession with the President, even before the doctors took the stand. Furthermore, Dr. Rappeport downplayed the significance of Duran's gruesome fantasy in a way that likely reduced the force of this evidence, and may have mitigated the impact of other damning items of evidence as well. As the government elicited these statements in its cross-examination, Doctor Rappeport twice stressed that what Duran had said about killing the President described "more of a fantasy than a desire." This expert characterization of Duran's hostile statements could have led the jury to find that some or all of the other damning statements by the defendant were likewise merely expressions of Duran's "fantasies."

There was indeed "gruesome and graphic" testimony presented at Duran's trial that would not have been presented during the merits phase of a bifurcated trial. We conclude, however, that Duran was not unfairly prejudiced by this testimony because overwhelming independent evidence of Duran's murderous hostility towards the President would have been presented in the merits phase of a bifurcated trial, and so the incremental impact of this macabre fantasy was minimal.

### c. The Trial Judge's Conduct Toward Defense Experts

■ The defense also argues that statements made by the court to the insanity experts exacerbated the prejudice caused by the unitary trial by revealing to the jury the court's bias in favor of the prosecution.

**6.** "What Mr. Duran did was to fire at the White House as a symbol ... and at this force that was controlling the White House ... but he didn't try to kill the President of the United States, and he didn't assault any Secret Service Officers...." Tr. 4/3/95 at 39–40.

The merits defense actually used at the trial appears to have diverged somewhat from the merits defense proffered in support of the pretrial bifurcation motion. As presented to the jury, the merits defense seemed to include both the notion that the only person Duran intended to harm was himself ("Mr. Duran clearly believed from these letters that he was going to die. The letters show that, in fact, when he was

tackled he said to the Secret Service Officers, why didn't you shoot me?" Tr. 4/3/95 at 45), and that Duran fired toward the White House with the intent of killing an evil mist ("He was driven by his thoughts, and his craziness, and these beliefs and ideas in his head, to fire at the White House, at this mist that he believed was controlling the White House. But he wasn't trying to hurt anybody. He wasn't trying to kill anybody." Tr. 4/3/95 at 71.).

**7.** "Because of that disease, that paranoid schizophrenia, he did not appreciate that what he did was wrong...." Tr. 4/3/95 at 99.

Brief of Appellant at 39–40. The defendant stresses that he makes this claim as a sub-part of his argument regarding bifurcation, rather than as an independent claim for relief,[8] urging that the judge's comments, when added to the other allegedly prejudicial factors affecting his trial, tip the balance toward the conclusion that he deserves some remedy for the failure to bifurcate. But the judge's comments cannot be the last straw in the bifurcation analysis unless they were improper in their own right, so we must begin by asking whether these comments tended to prejudice the defendant by creating an impression of judicial partiality in the minds of the jurors.

Our cases addressing claims of improper judicial questioning have established that a trial judge is not a "mere moderator," but rather is charged with assisting the inexperienced laypersons who will render a verdict in understanding the nature and import of the often complex and always conflicting evidence presented at trial.[9] To this end, the judge may properly make comments and ask questions designed to clarify testimony or to manage the presentation of evidence, but the judge must avoid any appearance of partiality and must avoid becoming, or seeming to become, an advocate for either party.[10]

Viewed in context, all but two of the nine allegedly improper comments to defense experts appear to us to have been clearly appropriate efforts to manage the presentation of evidence or to clarify issues for the benefit of the jury.[11] Two of the judge's comments were more problematic, in that they tended to veer away from clarification and towards cross-examination. In one instance, after a defense expert testified that twenty studies of schizophrenia supported his conclusions about the defendant, the judge asked the witness whether he had reviewed any studies conducted by the Menninger Foundation, and seemed to press the witness to acknowledge that it would be appropriate to include a Menninger Foundation study in a survey of studies dealing with schizophrenia.[12] At the close of the direct examination of the same witness, the judge interposed a series of

8. Brief of Appellant at 39–40 ("the district court gave the jury every indication that the defendant's doctors were not credible, while the government ones were. This exacerbated the prejudice from the failure to bifurcate the trial, because the impression the district court gave the jury about the defense had to affect the guilt part of the trial, too."); Reply Brief of Appellant at 9 ("The government's plain error analysis misses the mark; defendant is not raising this as an independent ground for relief, but only to show that the district court by its questioning made an already unfair situation even worse.").

9. See United States v. Barbour, 420 F.2d 1319, 1320–21 (D.C.Cir.1969) (quoting Billeci v. United States, 184 F.2d 394, 402 (D.C.Cir.1950)).

10. See United States v. Winstead, 74 F.3d 1313, 1319 (D.C.Cir.1996); United States v. Spencer, 25 F.3d 1105, 1109–10 (D.C.Cir.1994); United States v. Norris, 873 F.2d 1519, 1525–27 (D.C.Cir.), cert. denied, 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989).

11. The defendant complains that the judge said, during the testimony of a defense expert, "[l]et's try to speed this up, so that we get all the information that we need." Tr. 3/27/95 at 198. But before the judge said this, defense counsel had conducted direct examination filling thirty-seven pages of the record with only two one-sentence questions from the judge, and had told the judge that he would continue to examine the witness for between forty-five minutes and an hour, creating his own time constraint.

Except for the two items we discuss separately, all of the other comments in which the defendant asks us to find prejudicial error could only have given the jury an impression of judicial favoritism if they were delivered in a dramatically ironic manner, which the defendant has not claimed was the case. These included, for example, questions about the degree of subjectivity involved in the making of psychiatric diagnoses and the applicability of the term "reasonable medical certainty" to a particular witness' conclusion.

12. "THE COURT: Did you review any of the studies done by the Menninger Foundation in Kansas? THE WITNESS: I don't believe that among those twenty studies any came from the Menninger Foundation. THE COURT: What is their principal function at the Menninger Foundation? THE WITNESS: Well, the Menninger Clinic I think you are referring to is a large psychiatric clinic. THE COURT: To study schizophrenia, is it not? THE WITNESS: Among other things they certainly study schizophrenia. THE COURT: That's their main focus, isn't it? THE WITNESS: You know, your Honor, you may know more about it than I do. I am aware of other studies that come out of the Menninger Foundation but it may be that schizophrenia is their primary focus." Tr. 3/28/95 at 79–80.

questions suggesting extreme skepticism on the expert witness' claim that the word "sputing," which Duran had used in the course of a Rorschach test and which the witness had described as a made-up word evidencing Duran's insanity, was indeed not a legitimate word.

Because the defendant failed to object to these two lines of judicial questioning at trial, we determine whether they created unfair prejudice in their own right under the "plain error" standard elaborated in *United States v. Olano*,[13] which directs us to focus on whether the questioning "seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceeding[ ]."[14] We cannot conclude that these two sets of questions so affected this proceeding. They consisted of two brief and largely peripheral exchanges with a single witness in the course of a long trial and, though arguably improper, the questions were not so hostile or slanted that they could on their own have convinced the jury that the judge was endorsing the government's case and disparaging the defendant's.

The defendant's claim that the judge's comments exacerbated the prejudice resulting from the failure to bifurcate is based not only on the judge's treatment of defense experts, but also on the judge's allegedly more complimentary treatment of the government's experts, which the defendant says exacerbated the appearance of judicial partiality towards the government. But the three comments singled out by the defense as creating the appearance of favoritism toward the prosecution do not appear likely to have suggested any such partiality, and we find no merit in the defendant's contention that the judge's comments to the defense and government experts, taken together, sent the

message that the judge believed the government's experts to be more credible.[15] Thus the defendant's argument that the judge's comments and questions created unfair prejudice is without merit.

After reviewing all of the elements of Duran's argument that he was unfairly prejudiced by the court's failure to bifurcate his trial, and after considering the likelihood that these elements could have created unfair prejudice either individually or in their aggregate effect, we find that the trial court's refusal to bifurcate Duran's trial did not create unfair prejudice.

**B.** *Application of the Attempted Assassination Statute to Duran's Actions*

■ 18 U.S.C. § 1751(c) provides, in pertinent part: "Whoever attempts to kill [the President of the United States] shall be punished by imprisonment for any term of years or for life." The defense argues that Duran's conviction under § 1751(c) should be reversed because Duran shot at Dennis Basso, who is not the President. But under the statute and the common law of attempt which it incorporates, the identity of the person at whom Duran fired his assault rifle is irrelevant, given the overwhelming evidence that, in the days and hours before the shooting, he engaged in numerous "substantial steps" towards his objective of assassinating the President.

■ Although § 1751 does not define "attempt," we have deemed it to incorporate the common law definition of criminal attempt.[16] We have also noted elsewhere that most federal courts adhere to the definition of criminal attempt outlined in the Model Penal Code,[17] which establishes that a defendant is

---

**13.** 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

**14.** *Id.* at 736, 113 S.Ct. at 1779 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

**15.** One of these comments appears to have been a flippant suggestion that unspecified participants in the trial proceedings should be submitted to the care of a psychiatrist testifying for the government, and the other two were efforts to clarify testimony regarding one expert's creden-

tials and another's general statements about the nature of schizophrenia.

**16.** *See Braxton v. United States*, 500 U.S. 344, 351 n. *, 111 S.Ct. 1854, 1859 n. *, 114 L.Ed.2d 385 (1991) (citing *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952)).

**17.** *United States v. Lam Kwong–Wah*, 924 F.2d 298, 303–04 n. 2 (D.C.Cir.) (citing *United States v. Dworken*, 855 F.2d 12, 16 (1st Cir.1988) and *United States v. Mandujano*, 499 F.2d 370, 376–

guilty of an attempt to commit a crime if, "acting with the kind of culpability otherwise required for commission of the crime," he "purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."[18]

The trial judge here instructed the jury on the "criminal purpose" and "substantial step" components of attempt,[19] and the jury heard evidence indicating that Duran had on numerous occasions expressed, both verbally and in writing, a strong desire to kill the President, and that Duran had purchased a rifle, ammunition clips, and an overcoat large enough to conceal the rifle (all of which he would eventually use in firing toward a man on the White House lawn who resembled the President), then traveled to Washington, D.C. and stood by the White House gate with the rifle and ammunition concealed. The jury had ample evidence, then, from which to conclude that Duran purchased weapons, ammunition, and the overcoat, traveled from Colorado Springs to Washington, D.C., and stood in front of the White House for several hours with the weapons and ammunition on his person, with the purpose of assassinating the President. Furthermore, the jury was entitled to find that these acts constituted "substantial steps" taken in pursuit of this objective. *See Lam Kwong–Wah,* 924 F.2d at 301 (defendants accomplished a "substantial step" towards completing the crime of drug distribution by negotiating with an undercover agent and giving the agent samples of heroin); *State v. Smith,* 115 Wash.2d 775, 801 P.2d 975, 979–80 (1990) (holding that the State had made a *prima facie* showing of attempted murder with $100 bills found in defendant's pocket, a survival-type knife found strapped to defendant's leg, a pair of handcuffs in another suspect's possession, guns, knives, and ammunition found in the passenger compartment of the car the defendant was driving, and several more weapons and survival items found in the trunk of the car). *See also* MODEL PENAL CODE § 5.01(2) (1985) ("the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient [to prove the completion of a 'substantial step'] as a matter of law: ... lying in wait, searching for or following the contemplated victim of the crime ... reconnoitering the place contemplated for the commission of the crime ... possession ... of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances.").

Because the jury had ample evidence from which to conclude that Duran had already completed the crime of attempted assassination of the President before he began firing towards Dennis Basso, we need not decide whether the evidence would have been sufficient to support the conviction had the government been unable to prove that Duran had already taken such "substantial steps" before he began firing. It remains significant that the man Duran eventually fired at resembled President Clinton, because this fact reflected back on Duran's actions prior to the shooting, helping to show that he bought the weapons, ammunition, and overcoat, and brought himself and these items to the sidewalk in front of the North Lawn of the White House, with the purpose of nearing his objective of taking the President's life. The fact that Duran was mistaken in thinking that the man he fired at was the President could not erase the multitude of "substantial steps" that he had already completed, and therefore we hold that the jury

---

77 (5th Cir.), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975)), *appeal after remand,* 966 F.2d 682, *cert. denied,* 506 U.S. 901, 113 S.Ct. 287, 121 L.Ed.2d 213 (1992).

**18.** MODEL PENAL CODE § 5.01(1)(c) (1985).

**19.** "[T]he essential elements of the crime of attempting to kill the President, each of which the government must prove beyond a reasonable doubt, are as follows: First, that on or about October 29, 1994, the defendant intended to kill President Clinton, and second, that the defendant took a substantial step towards killing the President. The defendant must have done more than prepare to commit the murder. He must have committed an act or acts reasonably adapted to accomplish the crime of killing the President." Tr. 4/3/95 at 122–23.

was presented with sufficient evidence to support its conclusion that Duran violated § 1751 by attempting to assassinate the President of the United States.

### C. Sufficiency of the Evidence Supporting Duran's Convictions for Assaulting Federal Officers

■ Four Secret Service Officers stationed on the North Lawn took cover, and attempted to approach and subdue Duran, while he was firing across the lawn. On that basis, the government charged Duran with four counts of violating 18 U.S.C. § 111. The jury convicted him on all four counts, and he was sentenced to ten years' imprisonment on each. Section 111 reads, in pertinent part:

Whoever ... forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties ... shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than three years, or both.... Whoever, in the commission of any acts described [above], uses a deadly or dangerous weapon or inflicts bodily injury, shall be fined under this title or imprisoned not more than ten years, or both.

Persons designated in 18 U.S.C. § 1114 include "any officer or employee of the Secret Service."

The Model Penal Code's definition of Assault includes the following language:

"a person is guilty of [simple] assault if he: (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (b) negligently causes bodily injury to another with a deadly weapon; or (c) attempts by physical menace to put another in fear of imminent serious bodily injury .... a person is guilty of aggravated assault if he: (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon." [20]

The defendant contends that the jury was not presented with sufficient evidence from which it could have concluded beyond a reasonable doubt that Duran saw or aimed at any of these four Secret Service officers as he was firing. We agree. There was no evidence that Duran actually saw Officers Persons, Coffey, or Wilson, and only scant evidence that he saw Officer Tejeda.[21] The evidence thus did not permit the jury to conclude beyond a reasonable doubt that Duran "attempted to cause ... bodily injury to" any of these officers, because an attempt requires that the defendant have acted with the purpose of completing the attempted crime, and Duran cannot be said to have had the purpose of injuring four complete strangers when there was no evidence that he aimed at them, or even saw them, while he was firing. And although his act of firing twenty-nine bullets across the North Lawn certainly evinced a reckless state of mind with regard to anyone present on the North Lawn, Duran did not "recklessly cause[ ] bodily injury" to any of the four Secret Service officers, because none of these officers was actually injured.

The jury did, however, have sufficient evidence from which to conclude that Duran fired his last several shots across the North Lawn, as he was running east along the fence, with the purpose of putting the Secret Service officers on the North Lawn in fear of imminent serious bodily injury. More particularly, the jury could reasonably have concluded that Duran's purpose in firing a bar-

---

**20.** MODEL PENAL CODE § 211.1 (1985).

**21.** Officer Tejeda testified that he had been standing on the North Portico of the White House when the firing began, and the jury was shown a photograph indicating that Officer Tejeda may have been visible from where Duran stood. One of Duran's bullets hit the North Portico, but Officer Tejeda didn't hear it, and couldn't say whether it had struck the White House before or after he stepped down from the portico.

rage of bullets as he ran along the fence was to fend off Secret Service agents he knew or had every reason to believe would be present somewhere on the North Lawn, in order to prevent them from apprehending him before he had a chance to reload his weapon.

Ample evidence was presented at trial to demonstrate that Duran was aware that Secret Service agents would be present on the grounds of the White House, and that these agents would quickly respond to shots fired in the direction of the Presidential residence. In fact, Duran seemed resigned to the fact that he would be killed in the course of his attack. Just before leaving for Washington, Duran told co-worker David Millis that Millis probably would never see him again, because Duran "figured he was going to be shot and killed." Tr. 3/21/95 at 18. Just after the shooting, as the officers wrested Duran's weapon from him, Duran told them: "I wish you would have shot me." Tr. 3/22/95 at 161. The officers found a folded piece of paper in Duran's wallet on the outside of which Duran had written " 'Hey!' Secret Service." Appellee Appendix ("App.") Volume B, Tab 1, Gov. Exh. 155A–2. Inside, the note included Duran's address and this request: "Please send my truck to my wife and son." App. Volume B, Tab 1, Gov. Exh. 155A–1. Searching his truck after Duran was arrested, law enforcement agents found a handwritten document with the heading: "Last will and words." Tr. 3/22/95 at 9.

The jury also was given evidence showing that, between the time Duran stopped shooting and his apprehension by civilian Harry Rakowsky, he was trying to reload his weapon. The jury heard that Duran had purchased a very large amount of ammunition, including extra thirty-round clips that he carried in his overcoat, and that he fired about thirty rounds from one such clip before he stopped shooting. Officer Persons testified, as he watched the videotape being replayed in the courtroom, that Duran was "reaching for his pocket" just after firing these shots. Tr. 3/22/95 at 143. Another witness testified that just before tackling Duran, he saw him look down at his weapon, and move his hand toward it. This witness concluded that Duran "was probably either trying to reload the weapon or unjam it." Tr. 3/22/95 at 213–14. Officer Tejeda testified that, after the shooting, he saw Duran "holding some dark weapon, a dark rifle"; Tejeda described Duran's actions thus: "He—I guess he was trying to reload, because he had stopped shooting...." Tr. 3/23/95 at 83–84. All of this testimony provided a solid basis for the conclusion that Duran was trying to reload his weapon just after he stopped firing, which supports the inference that he fired the last several shots with the purpose of fending off Secret Service officers whom he expected would otherwise be close enough to apprehend him before he finished reloading his weapon.

The conclusion that Duran fired while running east along the fence with the purpose of putting Secret Service agents stationed on the North Lawn in fear of imminent serious bodily injury squares with the overall militaristic character of his attack. Duran, who had served in the military, arrived at the White House well-equipped with weapons and a large quantity of ammunition. Until he began running, his firing had been deliberate and focused, peppering the ground and trees around a small group of men. It would have been odd for Duran subsequently to begin firing haphazardly for no purpose at all, and the jury was entitled to reject Duran's claim that he was firing at an "evil mist." The testimony of three separate witnesses, one of whom was close enough to tackle Duran immediately after making his observation, supports the conclusion that Duran was trying, just after he fired these last several shots, to reload his weapon. Therefore, the conclusion that Duran fired his last several shots with the purpose of making the Secret Service officers present on the North Lawn fear that they would be struck by one of these shots, and thus that he assaulted the officers by "attempt[ing] by physical menace to put [the officers] in fear of imminent serious bodily injury," was well supported by the evidence.

 Finally, although this issue was not raised by the parties, we recognize the need to provide some explanation not only for the facial applicability of § 111 to Duran's actions, but also for the application of that portion of the statute describing the crime

for which a ten-year sentence is appropriate. Duran received ten-year sentences for each of his four § 111 convictions, and the statute caps the sentence at one year in prison when the acts in violation of the statute constitute "only simple assault." The Model Penal Code includes the form of assault involving an "attempt[ ] by physical menace to put another in fear of imminent serious bodily injury" within the category of "simple assault," and this is the only variety of assault of which the jury could have found Duran guilty beyond a reasonable doubt, based on the evidence presented at trial. Despite its language limiting the sentence for "simple assault" violations to one year, however, § 111 authorizes courts to impose ten-year sentences on defendants who "use[ ] a deadly or dangerous weapon" in the course of "assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" federal officers. Under the Model Penal Code, by contrast, the use of a deadly weapon can ratchet the offense up from "simple assault" to "aggravated assault" only if the defendant used the weapon to "attempt[ ] to cause or purposely or knowingly cause[ ] bodily injury to another," and according to the assault theory applicable to Duran's actions, he used the weapon with the purpose of creating the *apprehension* of bodily injury, but not with the purpose of *actually causing* bodily injury. That is, Duran was indifferent as to whether his scattered shots actually hit any of the officers, because his sole purpose was to keep them far enough away from himself that he would have time to reload. Thus, § 111 seems both to authorize the imposition of a ten-year sentence on Duran, by its reference to the use of a deadly or dangerous weapon, and to prohibit the imposition of this sentence in this case, by its one-year cap for violations that constitute "only simple assault."

We resolve this ambiguity by reference to another passage from the statute, which we believe demonstrates a legislative intent to diverge from the common-law definition in regard to the significance of the use of a deadly or dangerous weapon in setting the level of the assault. Specifically, the statute provides for a ten-year sentence for defendants who "use[ ] a deadly or dangerous weapon *or* inflict[ ] bodily injury" in the course of assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer (emphasis added). The disjunctive language in this passage indicates the legislature's intent to make the use of a deadly or dangerous weapon sufficient, even for defendants who were not attempting to cause, and who did not purposely or knowingly cause, bodily injury, to boost the crime above the level of "simple assault." Accordingly, we find that the act of using a deadly weapon with the purpose of causing Secret Service agents to fear imminent serious bodily injury constituted a crime punishable by ten years' imprisonment under § 111.

### III. CONCLUSION

The trial judge exercised reasonable discretion in denying Duran's motion to bifurcate the trial, and the failure to bifurcate the trial did not prejudice the defendant's merits or insanity defenses. The attempted assassination statute, 18 U.S.C. § 1751, was properly applied to Duran, and the jury had sufficient evidence to find him guilty, under 18 U.S.C. § 111, of assaulting the four Secret Service agents stationed on the North Lawn. Accordingly, the defendant's convictions are

*Affirmed.*